Good morning, Council. It looks like you're ready to proceed. I think, Mr. Janich, you're going to be starting us off, and you're appearing by Zoom today. Is that correct? Yes, I am. Thank you. All right. You may proceed. May it please the Court. My name is Eitan Kasteljanich, and I'm representing James Coble in this appeal. Coble has been unable to work since at least June 2017 due to the combined functional effects of his many impairments, including generalized anxiety disorder, agoraphobia, major depressive disorder, and asthma. Now, the two main errors in this case involve the ALJ's improper rejection of the opinion of an examining psychologist, Dr. Wingate, and his failure to acknowledge that the medical health therapist, Ms. Rios, are consistent with Dr. Wingate's opinion. And the other main error here involves the ALJ's improper rejection of Coble's testimony. Now, the elephant in the room here is, how does the Court review this? This case was decided by the ALJ based on new regulations, which purport to state, well, the only issues an ALJ must consider are the supportability and persuasiveness of a medical opinion when it comes to considering medical opinions. And there's not clarity from the Ninth Circuit yet about what legal standards should be used in reviewing medical opinion evidence that is arguably improperly rejected. It's long-standing law in the Ninth Circuit that an ALJ must provide specific and legitimate reasons for rejecting contradicted opinion. Now, Dr. Wingate's opinion is almost essentially uncontradicted. There's no treating or examining source that actually contradicts her opinion. And when an opinion is uncontradicted, it's long-standing Ninth Circuit law that an ALJ cannot reject that opinion unless the ALJ provides clear and convincing reasons. And the government, in this case, has been arguing that an ALJ can reject, can just simply state, I find this not persuasive. And the Court- Excuse me, counsel. I think there's a non-regulatory issue embedded here that is something I would appreciate your addressing. And my concern has to do with the Appeals Council's rejection of the 2019 follow-up opinion from Dr. Wingate. Because it appears to me that one of the reasons the ALJ had for not believing Dr. Wingate and therefore Dr. Rios had to do with the fact that there was other contradictory medical evidence that showed or purported to show that he was improving with treatment. The 2019 opinion from Dr. Wingate basically says, yeah, he's been treated, but he is not getting better. And the Appeals Council rejected that as irrelevant to the time period. And so my concern is whether it should have been looked at as having a relationship to the validity of the opinions about improvement with treatment. And that doesn't have anything to do with the regulation. I appreciate having both counsel address that issue. Thank you. Yes, and I agree with you on that 100%. If without that evidence, it's not as clear whether or not the level of improvement he had been experiencing was so great that it would actually allow him to work. I don't think it does. I think when you look at the overall evidence, for example, the fact that he went to a crab festival and survived it for about an hour and a half, that is not even remotely close to being able to attend to a competitive job for a 40-hour work week. But what about playing music in a coffee shop? So his big issue is he's got this agoraphobia, and he doesn't want to around people. I can't think of anything that would be less consistent with that than playing music in a coffee shop. Well, we don't have very much detail on exactly what that involves. Many of the ALJ's objections to Coble's testimony about his limitations involve issues that predated the relevant time period. For example, the fact that he met a woman and began a relationship a year before he's alleging disability says nothing about whether or not he's been disabled during the relevant time frame. Your Honor, I'll address that more in my rebuttal because I'm going to have to recheck my notes on that issue. But once again, turning back to Judge Graber's comment, the fact that Dr. Wingate's description really in both of her evaluations about the longstanding and severe nature of his social avoidance and how he basically does not go out and he's been working hard to get past that, taking medication and following his counselor's advice to try to get out there and do things. But he's not able to do that on a sustained basis. Judge Wingate's 2019, so the second opinion notes, did they say that he was looking for a job? I'm sorry. Well, I think that's always going to be true. I mean, that's part of the, to try to get part-time work, to try to do something that would actually, that's good advice for somebody who's holed up and unable to socially function, is to try to find something you can do even part-time that will get you out of the house and make you, get you going to do something. But that had not succeeded. So that's, once again, it's a therapeutic thing. That's actually what he should be trying to do. That's the whole point. Um, back to Judge Graber's comment about the Appeals Council evidence, though, I think that that evidence, the Appeals Council should have done more to actually address the fact that it shows the longitudinal, confirms the longitudinal nature of his impairment. And it does confirm that he continued to be very significantly impaired by his mental impairments. Um, it, I would like to reserve some time for rebuttal if I may. Do you have any questions? I don't. All right. That's fine, counsel. We'll hear from the Commissioner. Good morning. May it please the Court. Jeff Staples for the Commission. We ask that you affirm your statement because substantial evidence supports the ALJ's findings of fact. I'd like to turn to the opinion that Dr. Wingate submitted that Judge Graber was asking about. Um, Dr. Wingate did say that Coble had experienced really no improvement in his anxiety-related symptoms. But like Dr. Wingate's 2016 opinion, that was just plain inconsistent with the record. Um, at 457, one of Coble's treatment providers said, quote, individual has improved in social anxiety symptoms. So the evidence that the ALJ was pointing to in discussing Dr. Wingate's 2016 opinion really bore that out. But Coble was reporting that he was happier, that he was feeling better, that he was having more social experiences, that he was playing music in the coffee shop, as Judge Rice pointed out, that he was going out in public daily. And really, there just wasn't a treatment record that would go the way that Dr. Wingate was going and saying that, no, he has all these marked limitations. He can't do anything in public. Additionally, the mental status examination that Dr. Wingate conducted in 2016 was almost entirely normal. Coble interacted fine with her. He had some abnormalities in his affect. But really, other than that, there was nothing to support the marked limitations that she identified. So, too, in 2019, the mental status examination is almost exactly the same. So because the ALJ reasonably considered all of this evidence with respect to the 2016 opinion, and nothing was different in 2019, there just isn't any basis for reversing the ALJ's factual findings because of evidence that came in after the ALJ issued his decision. As for the regulatory change about how the ALJ considered the medical opinions, those are different, markedly, from this Court's ample precedent regarding specific and legitimate reasons and clear and convincing reasons. So those standards were built on a hierarchy of medical opinions, wherein the treating source opinion ordinarily would deserve the most weight, an examining source opinion was next, and medical sources that neither treated nor examined the claimant were ordinarily entitled to the least weight. That hierarchy is gone. The new regulations, and we've set forth in our brief the Federal Register site, wherein the Commissioner explained the reasons for doing that, that was subject to notice and comment. The Commissioner took into account many comments and explained why they were adopted or not, but really went through a great, elaborate explanation about why these changes were being enacted. Counsel, this issue was, as I recall it, not raised until the reply brief. If I'm correct about that, hasn't it been forfeited, and do we need to analyze the new regulation at all, or its validity, rather? Well, Your Honor, the argument that the new regulations are arbitrary and capricious, that really doesn't show up until the reply brief. And it's true that Coble really, in the opening brief, was not fully grappling with the change that the new regulations brought out. However, I think it was important to note that, and that was why our brief did so, that this case can't be analyzed under the prior standards. Now, to the extent that he waved some arguments about the challenge to those regulations, I agree with you. The opening brief really doesn't contain any, but I don't think that means that you have to set aside the new regulations altogether. No, right, that wasn't my question. It was probably a vague question. My question is whether we have to address the validity of the regulation or whether it is arbitrary and capricious. I think if you wanted to consider that, I think you do have to either take for granted the validity of the new regulation. You could certainly do that and take them for granted and say, you know, these new regulations are here, the old case law is gone. But I don't think that his failure to argue against the new regulations means that we just have to go with the old standards. Is that answering your question? It's answering a different question, but I understand your position. Thank you. Sorry, Your Honor. I just don't want to— The point, counsel, is that we need to analyze this under the new regulations. Yes. But you agree, your argument is that to the extent he's trying to challenge the new regulations, that that argument has been waived as far as— Yes, that's our position. And I just wanted to make it clear that these new regulations are not consistent with the standards on which COBOL is trying to rely. So he's citing cases like Garrison, Ghanem, Revels, Lester, Orne, cases that were built on that hierarchy of medical opinions. So, you know, as he was talking about, you've got clear and convincing reasons for uncontradicted treating and examining opinions, but not reviewing opinions, and specific and legitimate reasons to reject opinions from contradicted treating or examining opinions, but not reviewing positions because they were the lowest under the former hierarchy. But the problem is that that hierarchy is not present in the new regulations. I think we're familiar with that. Counsel, I was a little surprised in this, and I think some other cases you may have, to see that you can submit evidence after the ALJs already. I guess I haven't had enough of these Social Security cases yet. It seems like an odd circumstance. Usually you're sort of stuck with the record, but this is kind of a way, I guess, to add the record. One thing I'm not familiar with is how much time—I mean, if you wait too long, and that was one of your arguments, I think, is that this isn't relevant to the period, but I and the physician reviews the person and has an opinion that presumably that opinion would carry back into the relevant time period. But what do the cases say as far as how late is too late and how soon is soon enough? Because this was two months in this case, is that right? Yes, Your Honor. It was a few months after the ALJ's decision, and I think this is a great question. So, the Commissioner's regulations permit the submission of evidence as part of your request for review of the ALJ's decision to the Appeals Council. So, you have your hearing with an ALJ. The ALJ issues a decision. If you don't like that decision, you can request review of that from the Appeals Council. As part of that request for review, you can submit new evidence. It seems to me that that seems kind of weird that we let... Because if I was counsel, I'd go read the ALJ's opinion. I'd go to the physician, and I'd be like, I need you to poke some holes in this ALJ's opinion. It just seems like a really odd circumstance that we even allow that. As apparently, we do. But first of all, maybe we don't do it. Maybe you do. Is it your own regulations that allow that? The submission of evidence is allowed, but the evidence has to relate to the period that the ALJ considered. That means the period ending on the day of the ALJ's decision. So, if you submit evidence that you had other things going on after that, the Appeals Council won't look at that or won't consider that as part of the review of the ALJ's decision. It has to create a reasonable probability of changing the ALJ's mind. If it doesn't relate to the period, then it can't do that. Now, on top of the... These are non-adversarial proceedings. So, the commissioner is trying to give the claimant a chance to submit whatever evidence they want to submit. The issue for this court was developed in this court's Bruce case, Bruce v. Commissioner, in which this court held that that evidence submitted to the Appeals Council, when the Appeals Council makes it a part of the record, a reviewing court considers that evidence in deciding whether substantial evidence supports the ALJ's decision. And that kind of creates... As Your Honor is pointing out, it creates a little bit of an Alice in Wonderland situation where you're kind of pretending like this was before the ALJ or considering that as a part of the record, even though the ALJ never saw it. So, that does create some difficulty. But that evidence is in our record. It is in the record. And under this court's Bruce case, you do consider it. But because of Dr. Wingate's 2019 opinion, A, didn't discuss any functional limitations that she at least described as being present during the relevant period. And even if she had, the ALJ already considered almost an identical copy of that opinion from 2016. Is it your view that it doesn't... Let me just backtrack. The relevance of it to me is how credible are the opposing opinions that say he's improved a ton. And one can argue whether those improvements are significant in terms of working ability. But basically, it goes back and in that sense relates to what was said about the period in question. If supposedly he's improving, but she finds him unimproved, is that a permissible inference? Sure, it's permissible to say that Dr. Wingate's 2019 opinion contradicts the ALJ's finding that Koble improved. And that's true of the 2016 opinion also, to say that, you know, he has all these marked limitations. That contradicts the ALJ's decision too. I think the two opinions really do go together. Except that there's a time continuum that's there. In other words, if he was having problems at one point in time, got better, and then got worse, isn't that relevant? No. So if the theory is that he was bad in 2016 and then improved during the period under the ALJ's consideration, and then got worse again after the ALJ's decision, then that would not be relevant. I think the theory would have to be, you know, we got two months after the ALJ. Right. He got worse, not just in those last two months. Right. But what Dr. Wingate said is that he never improved. She looked back at her 2016 opinion and said, he's essentially the same. And that just isn't borne out by the treatment record, for the same reason that the marked limitations she identified in 2016 conflicted with all the treatment records on which the ALJ relied. There was really nothing to support that opinion. Right down to the mental status examination she conducted in 2016, and then through all these treatment records that the ALJ pointed to, showing he's happier, he's going out, he's playing music in a coffee shop. Even those records, though, say he plays music and then he gets really anxious, and a lot of the time he leaves before anything, you know, he has a performance, or he can do little tasks. I mean, it's limited improvement, isn't it? He, to be clear, and I see I'm out of time, but I just want to finish this thought. To be clear, he is not a person without limitations. This is not a person that has no limitations at all, that has no impairments at all. The ALJ did not find that. No, but the relevant question is whether these improvements are transferable to a work situation sufficiently to make him employable. And, you know, spending one and a half hours somewhere or going once or twice a week to play music for a few minutes and then getting really anxious and sweaty and leaving doesn't really bode well for a working situation, does it? Well, Your Honor, with respect, I think the relevant question is whether those records tended to support or tended to undermine Dr. Wingate's opinions and his own statements about that. He comes to the ALJ saying, I can hardly ever leave my house. That's exactly what he said to Dr. Wingate. I can't get out. I can't be with people. I can't do, you know, I can't do anything, essentially. But then the record shows that that's just not the case, and whether, you know, this is a person who has essentially never worked. So you can't really have that kind of evidence. He's a young guy. You can't have that kind of evidence showing, yes, he can work because he did. But when there's nothing in the treatment record to substantiate any of his claims or any of the limitations that Dr. Wingate identified, and really all the evidence was to the contrary, even though no one piece of evidence specifically shows that he can work, you know, that he can, that, oh, and he'll last for 40 hours in a week, I think when the treatment record as a whole paints such a different picture than what he's describing and what Dr. Wingate was describing, that is the definition of substantial evidence. That is more than a scintilla. That is evidence on which a reasonable mind could rely to find that Coble was not disabled. And for that reason, we'd ask you to affirm. Thank you, counsel. Thank you. I've gone on a little bit. Do either of my colleagues have any more questions? No, thank you. All right. Thank you, counsel. Mr. Janich. Thank you. I want to start by addressing the issue, and I think Judge Graber actually already addressed it well enough, or beyond well enough, which is that he's playing music in a local coffee shop that the judge, excuse me, the ALJ cited to one report where it's a treatment plan in which he was, individuals using community support more, he has engaged in playing his music in a local coffee shop.  And it doesn't go into the details, and Judge Graber talked about some of those details, which is his difficulty even doing that. With regard to some of the other issues that were raised, first of all, with regard to appeals counsel evidence, there is no time limit on how, you know, if the appeals counsel has got the case for a couple of years and new evidence comes to light, and this will sometimes, if there will be some, like a person with epilepsy that needs a certain type of test, which you might have to wait a year to actually get, and a year after the ALJ decision, they finally do the testing, and it completely changes the picture because there's significant objective evidence, and there's a medical opinion that says that this relates back. It just took us a year to get the person in to do this testing. That's an example of why the appeals counsel evidence is important, or can be important. It does have to relate back, that's critical, but it also, there's no strict time limit on it. Certainly the sooner it is afterwards, it can often have more relevance, but even later evidence can be very relevant. With regard to something that the opposing counsel said about, repeated from the ALJ's decision, about Dr. Wingate's first evaluation, and really her second as well, and that supposedly this would fail. They said that it didn't. There weren't objective findings to support it. My brief disgust is this. There were ample objective findings, including very significant testing that she did that showed that his anxiety was severe, as was his depression. Then I'm just going to start by, or end with, his own very beginning. First of all, in his testimony, he did describe doing things. He didn't say, I can't do anything. He described the things he was able to do. But the very beginning of the hearing, before he started testifying, the ALJ observed, on the record, that he doesn't look real happy to be here. Now, I was not at that hearing, but that's an indication of what the ALJ was observing right there, that this is a man who's socially a phobic, and he tried to push his own. But let me ask you, didn't the ALJ take that into consideration in the RFC by saying, you're not going to have any interaction with the public? You're only going to have occasional interaction with your coworkers. You're not going to be in a fast-paced production-type environment. Wasn't that something that was all reflected in the residual functional capacity? No, it was not, because it didn't include that there are times when he can't even leave his house. And so it would affect his ability to maintain normal attendance, expected attendance, in a competitive work environment. So that's what's missing from the ALJ's residual functional capacity assessment. If the court doesn't have any other questions, I would ask that you reverse the ALJ's decision and remand this case for a new hearing. Well, thank you to both counsel for your helpful argument. This case also is submitted, and that ends for the day. And we'll take all the cases under advisement. Thank you. All rise. The court for this session stands adjourned. Thank you.
judges: GRABER, VANDYKE, Reiss